**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**SELVIN DURANT, Defendant**

SX-02-CR-258

Superior Court of the Virgin Islands

Division of St. Croix

May 10, 2007

JOSEPH PONTEEN, ESQ., Department of Justice, St. Croix, U.S. Virgin Islands, *Counsel for Plaintiff.*

HAROLD WASHINGTON, ESQ., Territorial Public Defender, St. Croix, U.S. Virgin Islands, *Counsel for Defendant.*

D'ERAMO, *Judge*

## MEMORANDUM OPINION

### (May 10, 2007)

### I. INTRODUCTION

THIS MATTER is before the Court on the *Motion for Release and to Assert Title 19 V.I.C. 3637 Unconstitutional* of Defendant, Selvin Durant [hereinafter "Defendant" or "Durant"]. Defendant moves this Court to find that his continued detention at Golden Grove Correctional Facility is a violation of his due process rights under the Fourteenth Amendment of the United States Constitution. He further moves the Court to find "Title 19 V.I. Code Ann. § 3637" unconstitutional.[1]

For the reasons that follow, Selvin Durant is hereby ordered released from the custody of the Department of Justice and Bureau of Corrections. The Court further orders that the pending charges in criminal case numbers SX-02-CR-258 and SX-02-CR-227 are dismissed with prejudice. Both of these orders are stayed for thirty (30) days from the date of entry. The request to find Title 5 V.I. CODE ANN. § 3637 unconstitutional is denied.

### II. FACTUAL BACKGROUND

Selvin Durant is a thirty-six year old male who moved to St. Croix with his mother roughly fifteen years ago. The precise details of his life,

---

[1] The Court assumes Defendant's counsel intended to reference Title 5 V.I. CODE ANN. § 3637.

including his upbringing, education and employment history, if any, are unknown. Durant is not known to have a permanent place of residence and identifies himself as homeless. According to Virgin Islands Police Sergeant Kenneth Edwards, Durant is allegedly responsible for the assault and ultimately, the death, of Mr. Bruning "Junie" Bentick.

Sergeant Edwards' affidavit of probable cause alleges that at some time just prior to midnight on or about the evening of July 12, 2002, a concerned citizen reported that an assault had taken place in the vicinity of # 18 Company Street, Christiansted, St. Croix. (Edwards's Aff. 1). A witness who identified herself to police as an employee of Bentick's Liquor Store told police that she was standing across the street from the store where she observed Bentick engaged in a verbal argument with a person later identified as Durant. As she approached the scene of the argument, she claims Durant broke a glass bottle against the sidewalk and held the jagged edge of the bottle towards Bentick in a threatening manner. The witness claims she then ran into the store to grab mace and that when she returned Bentick was lying motionless on his back and Durant was walking away from the scene.

A second employee told police that he was sitting with Bentick outside the storefront at the time Durant approached. He claims Bentick questioned Durant about his reasons for loitering outside his store at the late hour and Durant only responded by making "animal-like" growling sounds. (Edwards's Aff. 2). The witness said that when the first employee ran into the store, Durant moved as if to pursue her. According to the second witness, Bentick called out to Durant in order to prevent him from pursuing the first employee. Durant responded by turning around and punching Bentick in the head with his fist. The blow caused Bentick to lose his balance and fall backwards, head-first, onto the street. The second witness said Bentick lay motionless as blood began to run from his ears.

St. Croix Response was called and Bentick was transported by ambulance to the Emergency Room of the Juan Luis Hospital where he was treated in the ICU for trauma to the side and back of his head. The attending physicians ultimately determined that Bentick had sustained a subdural hematoma, or bleeding on the brain, in the posterior region of his head. Bruning Bentick expired on July 15, 2002 at the hospital. An autopsy conducted on July 19, 2002 by the Medical Examiner confirmed the diagnosis of subdural hematoma and produced other findings that

corroborate the witnesses' account for the nature of Bentick's injuries. (Autopsy Report, 1, July 19, 2002.)

## III. DISCUSSION

This court has subject matter jurisdiction pursuant to Title 4 V.I. CODE ANN. § 76(b) (1921, amended 1990). The Court must consider two issues. First, the court must determine whether Durant has been detained at Golden Grove Correctional Facility in violation of his procedural due process rights under the Fourteenth Amendment of the United States Constitution. Second, the court must determine whether Title 5 V.I. CODE ANN. § 3637 (1921, amended 1964) is unconstitutional as it applies to Durant. The Court evaluates each in turn.

### A. Fourteenth Amendment Procedural Due Process Claim

This matter is one of first impression for the Superior Court of the U.S. Virgin Islands. Defendant is charged with one (1) count of Assault in the First Degree in violation of Title 14 V.I. CODE ANN. § 295 (1921) and one (1) count of Voluntary Manslaughter in violation of Title 14 V.I. CODE ANN. § 924(1) (1921).[2] He has been in the custody of the Department of Justice since his arrest on or about July 12, 2002. He was never arraigned on the charges brought against him due to the court's June 30, 2003 ruling that Durant is mentally incompetent and unfit to stand trial. The Court begins discussion with the relevant procedure and law applicable to the immediate matter.

#### 1. The Process for Determining the Competence of a Person Charged With a Criminal Offense in the Virgin Islands

The Virgin Islands procedure for determining the mental competency of a party accused of a criminal offense is governed by the Federal Rules of Criminal Procedure and Title 18, Chapter 313 of the United States Code. The Federal Rules of Criminal Procedure are made applicable to the Superior Court of the Virgin Islands by Superior Court Rule 7, which provides:

> The practice and procedure in the Superior Court shall be governed by the Rules of the Superior Court and, to the extent not

---

[2] The assault charge is filed in a separate pending action as Criminal Case No. SX-02-CR-227. The Court's holdings apply to both actions.

inconsistent therewith, by the Rules of the District Court, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence.

Rule 12.2(c)(1)(A) of the Federal Rules of Criminal Procedure provides that a court may order a defendant to submit to an examination and evaluation pursuant to 18 U.S.C. § 4241. Title 18 U.S.C. § 4241(a) provides that:

> At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, or at any time after the commencement of probation or supervised release and prior to the completion of the sentence, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

The filing of the information and complaint in this action constitutes "the commencement of a prosecution for an offense" within the meaning of § 4241(a). Both the Defendant's counsel and the Government moved the court to conduct an evaluation of competence. The Government's motion properly cited the provisions of § 4241(a) as the basis for the request. The court ordered psychological evaluations and set a hearing in accordance with § 4241(b).

Title 18 U.S.C. 4241(b) states that prior to the date of a hearing to determine competence the court may order that a psychiatric evaluation be conducted and a report submitted pursuant to the provisions of Title 18 U.S.C. § 4247(b) and (c). Pursuant to subsection (b) of § 4247, the Attorney General is awarded custody of the Defendant for a "reasonable period, but not to exceed thirty days" so as to afford the Government the opportunity to place the person in a "suitable" treatment facility for proper psychiatric evaluation. Two evaluations took place. The first was conducted by Dr. Chester D. Copemann at the request of the Defendant's counsel. The second was ordered by the Court in accordance with

§ 4241(b) on November 14, 2002. That order directed Dr. Norma I. Carrillo of the Virgin Islands Department of Health to conduct an independent examination. Her examination took place on March 20, 2003, over three months after the period provided for by the statute.

Following an examination pursuant to §§ 4241(b) and 4247(b), examining physicians are required to submit a report that complies with Title 18 U.S.C. § 4247(c). Subsection 4247(c) reads in part:

> A psychiatric or psychological report ordered pursuant to this chapter shall be prepared by the examiner designated to conduct the psychiatric or psychological examination, shall be filed with the court with copies provided to the counsel for the person examined and to the attorney for the Government, and shall include—
>
> (1) the person's history and present symptoms;
> (2) a description of the psychiatric, psychological, and medical tests that were employed and their results;
> (3) the examiner's findings; and
> (4) the examiner's opinions as to diagnosis, prognosis, and—
> (A) if the examination is ordered under section 4241, whether the person is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist property in his defense

Dr. Copemann conducted an examination on August 7, 2002, submitting a report dated August 28, 2002 that contains all of the information required by the statute. Dr. Copemann details the history Durant provided at the evaluation along with the information he gathered from other hospital records and two prior judicial proceedings. Dr. Copemann's report indicates that Durant admitted to two prior stays in the neuropsychiatric wards of hospitals on both St. Thomas and St. Croix. He had no idea why the police would be interested in speaking with him but said: "[w]hen the police tells you come, you must go with them." (Copemann's Forensic Psych. Eval. 1.) A review of previous medical discharges indicated prior provisional diagnoses of *"Schizophrenia, Disorganized Type"* in 1994 and both *"Chronic Paranoid Schizophrenia"* and *"Substance Use Disorder-Psychotic"* in 2002.

(Copemann's Forensic Psych. Eval. 2.) During the exam, Dr. Copemann noted Durant's behavior included sitting in a "rigid, unmoving posture and [staring] out at space." Durant's staring remained unchanged for the duration of the exam and he provided prompt answers to every question. Dr. Copemann proceeded to administer a myriad of psychiatric and psychological tests in order to evaluate and determine the mental abilities of Durant.[3]

Dr. Copemann noted that it was difficult to identify a cause for Durant's delay or inability to perform certain cognitive tasks included in the tests. He could not determine conclusively whether Durant's performance was related to lack of education, mental disease or potential side effects of his psychiatric prescriptions. He noted specifically that Defendant appeared to lack reasoning and abstract thinking skills and that he spoke about things in a very simplistic yet concrete manner. The report included a finding that Defendant's IQ is between 65 and 71 based on his performance on the WAIS-R exam. Defendant's scoring plotted him in the range of intelligence described as *Mild Mental Retardation.* Alternative testing instruments (KIT and Goodenough-Harris) corroborated the findings of the WAIS-R exam.

When Dr. Copemann asked Durant about the cause for his incarceration Defendant denied knowing anything about charges against him or any of the facts associated with the assault of Bentick. He was unable to articulate the roles of the prosecutor or defense counsel and he did not view his incarceration to be a consequence of any wrongdoing on his part. During the interview Durant said, "If you're a better person to the judge they'll get you out of jail or get you in jail—its how they feel." (Copemann's Forensic Psych. Eval. 4.)

Dr. Copemann's examination resulted in finding that Durant suffered from a mental disease or defect that rendered him mentally incompetent and unable to understand the nature and consequences of the proceedings against him or assist properly in his defense. His mental illness included

---

[3] The tests listed in Dr. Copemann's report include the Mental Status Examination (MSE), Competency Evaluation Instrument (CEI), Goodenough-Harris Drawing Test, Wechsler Adult Intelligence Scale Revised (WAIS-R), G.H. Kent Intelligence Test (KIT), Wide Range Achievement Test-Revision 3 (WRAT3) and the Rorschach Inkblot Test (Rorschach). Dr. Copemann's report also indicates that he reviewed a Medical Report dated March 28, 1994 from Dr. Robert Smith and a Medical Discharge Instruction sheet dated May 28, 2002 written by Dr. Olaf Hendricks.

delusions, confusion and a distortion of reality. Dr. Copemann concluded that Durant was incapable of understanding the rightness and wrongness of his actions. He recommended that Durant be transferred to a residential facility specializing in services for the severely mentally ill who concurrently suffer from retardation.

Dr. Carrillo conducted her examination on March 20, 2003. The record is unclear as to when she wrote her report but it was received at the Superior Court on April 14, 2003. Her report fails to comport with almost all of the requirements of § 4247(c) and for all practical purposes is not helpful in the evaluation of Durant's competence. Her report consists of the 29 very simple questions used to briefly interview Durant, along with the responses he provided. The questions Dr. Carrillo asked Durant during her very brief interview call into question the justifications for her findings. Many of them were simple "yes" or "no" style questions. Some were worded in a way that indicates there was a preexisting presumption of mental illness as opposed to a completely objective evaluation. For example:

> Question: Do you think you have a mental illness?
> Answer: No
>
> Question: When you are alone, do you hear voices?
> Answer: No
>
> Question: Do you see things?
> Answer: No
>
> Question: What do you think is your problem?
> Answer: I don't think I have a problem.
>
> Question: Why are people in jail?
> Answer: People who have committed crime.
>
> Question: Do you know you are going to court?
> Answer: Yes.
>
> Question: What is the duty of an attorney?
> Answer: To get you out of the situation or crime you are in.

(Carrillo's Psych. Eval. 1-3).

The Court notes that an ordinary person would find nothing unusual about any of the answers offered by Defendant to these or the other

285

questions posed by Dr. Carrillo. Carrillo's report states that she had never met Defendant prior to their March 20, 2003 evaluation. Dr. Carrillo offers no evidence that Durant submitted to any known psychological assessments exams on the date of his evaluation at her office. None of the questions she asked or answers Durant provided led to follow-up questions.

After evaluations are conducted and reports are submitted pursuant to §§ 4241(b) and 4247(b) and (c), § 4241(d) orders that a hearing be held in accordance with § 4247(d). Section 4247(d) requires that a person whose mental condition is the subject of a hearing be represented by counsel and that he be afforded the opportunity to testify, present evidence and subpoena witnesses as well as confront those against him.

A hearing was held by the Court in accordance with § 4247(d) on June 30, 2003. The parties brought only Drs. Copemann and Carrillo to testify as witnesses and the Court accepted their qualifications as experts.

Dr. Copemann was called to testify to his evaluation, methodologies and conclusions concerning the Defendant's mental state. He provided the Court with details related to the tests administered, including the purpose of the tests, the nature of the tasks performed, the corresponding score and reliability of the findings. He provided the Court with specific illustrations of where the Defendant demonstrated limited mental capacity. He explained: "You ask him questions like how are a lion and a tiger alike. He said they are amphibians." (Competency Hr'g Tr. at 14:15-16, *People v. Durant,* SX-02-CR-258, June 30, 2003.) Dr. Copemann's testimony was consistent with the findings of his report. He found that the Defendant did not appreciate the nature of the charges against him, was unfit to stand trial and incapable of assisting in his own defense. He further recommended to the Court that the Defendant be treated at "[a] residential facility that specializes in services to the severely mentally ill, who suffer concurrently with mental retardation." (Hr'g Tr. 17:16-19.) Dr. Copemann then advised the Court that he only knew of such facilities to exist on the mainland, and to his particular knowledge, "Georgia [and] Florida." (Hr'g Tr. 18:2-5.)

Dr. Carrillo was then called to the stand. She admitted to having reviewed Dr. Copemann's report before her own examination. (Hr'g Tr. 27:23-25.) On examination the Government asked Dr. Carrillo how she reached her conclusions of "mild mental retardation" and "limited

ability" without having conducted any psychological examinations of her own. (Hr'g Tr. 28:14-18.) She responded:

> [T]he way he presented himself at the time of my interview. Because, you know, I have seen a lot of clients at the time of interview, the facial appearance, the way they communicate with me, the way they dress up, you can have an impression that their intelligence are just like anybody that have normal intelligence. Plus, Dr. Copemann's report is almost complete from the general data, identifying data pertinent to history, plus the psychological testing. (Hr'g Tr. 28:23-29:6.)

She went on to describe why she believed he was incapable of understanding the proceedings before him. In doing so she stated that, at times, "something with pop into their mind that you can get a legitimate answer." (Hr'g Tr. 29:18-19.) When questioned further as to the meaning of "legitimate answer," Dr. Carrillo responded:

> Well, legitimate answer means everything is appropriate. Like his answer is—most of the answer is I don't know. Then why are you—I am in jail because the police took me. You know. An intelligent or appropriate person will say, well I committed something, I committed wrong against the citizen and that's why I am like this. (Hr'g Tr. 30:6-12.)

The Government later again asked her to confirm that it was her opinion that he did not appreciate the legal proceedings against him. She replied:

> Yeah, he don't seem to give me that impression that he understands the seriousness. When you hurt something. You know, that died, my gosh.

> He did not give that impression that I am scared, and you know, what will happen to me. It's like the facial expression is like, what we call in psychiatry, vague facial expression. (Hr'g Tr. 33:6-12.)

When asked what conclusions she had drawn about Durant as a result of her examination, Dr. Carrillo responded:

> Well, I have the conclusion that he is not competent to stand trial; and I make the recommendation that he needed an inpatient

treatment to prevent injury to the community of St. Croix or to the U.S. Virgin Islands. (Hr'g Tr. 21:18-22.)

Dr. Carrillo's testimony raises some serious questions as to the methodology and reliability of her opinion in this matter. She has indicated that she did not conduct any of her own psychological tests beyond basic interview questions because Dr. Copemann had already provided such information. (Hr'g Tr. 28:23-29:6.) The Court ordered Dr. Carrillo to conduct her own exam in order to have independent expert opinions. When asked how she would independently justify her findings based on her examination alone, she revealed her opinion to be based primarily on impressions. Her report as well as her oral testimony reveals that she appeared to presume Durant's guilt. Reliance on these variables as opposed to more scientific or statistical evidence requires that her testimony and evaluation be given significantly less weight than that of Dr. Copemann.

The disposition of a competency hearing is governed by the provisions of Title 18 U.S.C. § 4241(d) and reads as follows:

> If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, *the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility—*
>
> (1) *for such a reasonable period of time, not to exceed four months,* as is necessary to determine whether there is substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; *and*
>
> (2) *for an additional reasonable period of time until—*
>
> (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or

(B) the pending charges against him are disposed of according to law;

whichever is earlier.

*If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit proceedings to go forward, the defendant is subject to the provisions of sections 4246 and 4248.*[4] (Emphasis supplied)

Despite the issues with Dr. Carrillo's testimony illustrated above, Dr. Copemann's testimony had significant evidentiary value, being premised upon proven scientific methods of examination. The Court determined that Defendant was incompetent to stand trial and unlikely to be of assistance to his counsel in his own defense. At closing argument in the competency hearing, the Government argued that Title 5 V.I. CODE ANN. § 3637(a) was applicable. As Government's counsel stated for the record:

And it initially deals with someone who is found not guilty by a jury. And it reads just briefly: "If the defense is the mental illness of the defendant, the jury shall be instructed if they find him not guilty on that ground—"

Which is not where we are because we are dealing the step before that, which is incompetency.

"—to state that fact in their verdict. The Court shall thereupon commit the defendant to a certified forensic unit for custody, care and treatment from which he should not be discharged until the Court is satisfied that he has regained his capacity for judgment, discretion, and control of the conduct of his affairs and social relations.

However, if no certified forensic unit exist in the territory, the defendant shall remain in the custody of the Bureau of Corrections to be treated by the appropriate physicians until the necessary

---

[4] Title 18 U.S.C. § 4248 is not applicable in the matter *sub judice* as it details the procedure for dealing with persons believed to be sexually dangerous on the basis of either the charges brought against them or upon findings in their psychiatric evaluation.

arrangements to transfer the defendant to a certified forensic unit outside of the territory.["]

In Subsection (b)., it goes on a little further: "When any person who has been confined in a certified forensic unit pursuant to the provisions of Subsection (a) or otherwise in accordance with law, and the superintendent or head of such forensic unit certifies that such person has regained his capacity for judgment, discretion and control of the conduct of his affairs and social relations—"

And it goes on and on.

(Comp. Hr'g Tr. 38:24-40:3, *People v. Selvin Durant*, SX-02-CR-258, June 30, 2003, *citing* tit. 5 V.I. CODE ANN. § 3637.)

The Government then went on to argue that the Defendant was subject to § 3637 and should therefore be transferred to the Bureau of Corrections until arrangements could be made to remove the Defendant to the proper facility outside of the Territory. (Hr'g Tr. 40:14-41:19.)

Defendant's counsel disagreed, arguing that the statute was intended to provide a remedy for persons found not guilty by reason of insanity and had been so convicted by a jury trial in accordance with law. (Hr'g Tr. 41:14-19.) Defendant's counsel was correct in his assessment of the law insofar as the applicability of § 3637 to the current matter. That statute clearly provides procedure for the detention of persons who have been found not guilty by reason of insanity—an affirmative defense employed during a criminal trial. No such proceeding exists in the immediate matter and is therefore irrelevant to Durant. Despite correctly noting the inapplicability of § 3637, Defendant's counsel mistakenly asked the Court to require the Government to pursue civil commitment proceedings, which are available under Title 19 V.I. CODE ANN. §§ 722-723 (1957). (Hr'g Tr. 41:20-42:3.) A proper request would have invoked the provisions of 18 U.S.C. §§ 4241-4248 under the legal authorities articulated herein.

The Court found that Durant was mentally incompetent and unfit to stand trial. The Court placed Durant in the custody of the Attorney General. The transcript indicates that this was done, in part, on Carrillo's recommendation that he be treated so as to prevent injury to the community. (Hr'g Tr. 43:25-44:15.) The Attorney General was ordered to identify a facility for Defendant's treatment within 60 days and to

provide treatment and counseling to the Defendant until such time that he is transferred. (Hr'g Tr. 44:16-22.)

Having been awarded custody of Durant at the June 30, 2003 Competency Hearing, the Government, through the Attorney General, is subject to the framework of § 4241(d). The Attorney General was charged with the hospitalization of Durant at a "suitable treatment facility" for four months or a "reasonable period" in order to determine whether he would ever recover from his mental incapacity and face the charges before him. *See* tit. 18 U.S.C. § 4241(d). A status hearing was scheduled and continued to August 18, 2003 to review a proposed resolution from the Attorney General. At that hearing the Government indicated that it had been evaluating treatment facilities on Puerto Rico and required additional time to comply with the Court's order. A continuance of thirty (30) days was granted in order for the Attorney General to provide the Court with the proper report and proposal. The matter was continued on multiple occasions between August of 2003 and March of 2004.

On December 12, 2003, the Government filed an informational notice with the Court stating that it had contracted with JARZOFRAH, Inc., located in San Juan, Puerto Rico, to transfer twelve (12) mental patients for mental health care. At a status hearing held on March 19, 2004, the People stated that the Defendant would be transferred to JARZOFRAH, Inc. in Puerto Rico by the end of March, 2004. The Court was satisfied with these premises and instructed the Attorney General to confirm his transfer so as to dispose of the criminal proceedings.

The transfer of Durant and other pending mental health patients never materialized. For reasons not specified in the record, the agreement with JARZOFRAH, Inc., at least insofar as it pertained to Durant, fell through sometime shortly after the March 19, 2004 status hearing. Following this, the Government decided it would construct a Forensic Psychiatric Unit at a facility located on-island in Anna's Hope. A hearing to show cause was ordered and on November 17, 2004 the Government stated that it was finalizing a mental health facility and expected it to be completed within a few weeks. The Government went on the record again and stated that Durant would be transferred upon completion, no later than year's end.

At the same November 19, 2004 status hearing the Court took testimony from Doris Hepburn of the Golden Grove Correctional Facility. Title 18 U.S.C. § 4247(e) provides that while in the custody of

the Attorney General, the director of the facility selected to treat the person committed to their care shall "prepare semiannual reports" and inform the court of the "rehabilitation programs that are available for persons committed in that facility." The Court asked Hepburn to testify about the treatment and counseling Durant had received in over two years of detention at Golden Grove. Hepburn testified that she had only been able to access Durant for any sort of evaluation on three occasions: July 21, 2002, shortly after his arrest; September 13, 2004; and mid-October, 2004. The Court expressed its displeasure with the lack of treatment and delays in the transfer of Durant and again directed the Attorney General to make arrangements that would provide Defendant with at least minimum care while waiting for completion of the new facility.

Months passed and Durant remained in Golden Grove Correctional Center. A status hearing intended to confirm Defendant's placement and transition scheduled for March 23, 2005 was continued to May 11, 2005 due to Durant's hospitalization in the psychiatric unit of the Juan Luis Hospital. At the May 11, 2005 hearing it became apparent that construction of the facility at Anna's Hope had been discontinued. The Court opted to monitor the situation and neither the Government nor Defendant proposed resolutions to the matter. Until the most recent status conference ordered *sua sponte* by the Court for February 9, 2007, this case was left inactive for nearly two full years.

### 2. The Actions and Inactions of the Attorney General's Office Constitute a Violation of Defendant's Due Process Rights

The due process clause of the 14th Amendment of the United States Constitution is made applicable to the Virgin Islands and has "the same force and effect [ ] as in the United States or in any State of the United States" by the Revised Organic Act of 1954, § 3 (1954). Virgin Islands courts have consistently upheld the applicability of the 14th Amendment of the U.S. Constitution to the citizens of the United States Virgin Islands. *See, e.g., Schuster v. Thraen*, 18 V.I. 287 (1981).

The Due Process Clause of Section 1 of the Fourteenth Amendment states: "nor shall any State deprive any person of life, liberty, or property, without due process of law." The Fourteenth Amendment does not protect against all deprivations of liberty, but only those made "without due process of law." *See Baker v. McCollan*, 443 U.S. 137 at

292

145, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). The failure of the State to provide procedural safeguards constitutes a violation of due process. *See Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). Before a State can be liable for a violation of due process rights, the State must be charged with or assumed some duty to provide such procedural safeguards. *See DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189 (1989); *see also Harris v. McRae*, 448 U.S. 297, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980); *Lindsey v. Normet*, 405 U.S. 56, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972) (both holding that the government does not have an affirmative obligation to create or afford people due process where the government has not assumed a duty).

■ A violation of procedural due process cannot be the result of mere negligence. *See Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981). Rather, a violation of procedural due process rights by a State actor may involve a greater level of misconduct, and the level of such conduct depends on the nature of the procedural right asserted and the gravity of the breach claimed. See, *e.g.*, *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) ("invidious discriminatory purpose" required for claim of racial discrimination under the Equal Protection Clause); *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)) ("deliberate indifference" to prisoner's serious illness or injury sufficient to constitute cruel and unusual punishment under the Eighth Amendment); *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393; *Ingraham v. Wright*, 430 U.S. 651, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977); *Bell v. Burson*, 402 U.S. 535, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971). Thus, the first step to evaluating the Defendant's due process claim involves establishing that the Government had a duty to safeguard his procedural rights. *See Deshaney*, 489 U.S. at 195-198. If a duty does exist, the court must determine whether there was a breach of that duty and, if so, whether that breach rises to a level that gives cause to the Defendant's claim. *See id.*; *see also Daniels*, 474 U.S. at 329-30.

The United States Supreme Court has previously addressed the due process concerns of a person "detained indefinitely" after being found mentally incompetent. *See Jackson v. Indiana*, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972). In *Jackson*, two psychiatrists appointed by the court found Theon Jackson, a deaf-mute, to lack all communica-

tion skills and be completely incapable of understanding the charges against him or assisting his counsel in his own defense. *Id.* at 718. Indiana detained Jackson for over a year under a provision that permitted detention "until the person shall become sane." *Id.* at 715-16, *citing* IND. ANN. STAT. § 9-1706a. The Indiana statute, the *Jackson* court noted, was essentially identical to the federal statutes in 18 U.S.C. §§ 4241-4281. *Jackson*, 406 U.S. at 731. These are the same federal statutes at play in the immediate matter. *See id.* In evaluating Fourteenth Amendment Equal Protection and Due Process claims, the *Jackson* court made several findings relevant to the matter at bar.

Of greatest importance is the *Jackson* court's reliance on the holding in *United States v. Curry,* which found that indefinite detention is not prohibited, provided procedural requirements are followed. *See Jackson,* 406 U.S. at 732-33, *citing United States v. Curry,* 410 F.2d 1372 (1969). The court found that sufficient procedural safeguards exist in the federal statutes to justify indefinite detention. *See Jackson,* 406 U.S. at 731-33. The first of such safeguards is that detention can only be for the reasonable period of time necessary to determine the Defendant's chance of obtaining sufficient capacity to stand trial. *See id. at 733.* Second, if achieving capacity is unlikely but the Defendant remains such a threat, dangerousness can be established to permit extending detention. *Id.* at 731-32. "[T]o sustain a commitment", the *Jackson* court wrote, "[the elements of permanent incapacity and dangerousness are] not simply sufficient, but necessary." *Id.* at 736. Having been denied "formal commitment proceedings" that would have addressed his "ability to function in society," the State's justification for Jackson's commitment lacked the elements necessary for indefinite detention. *Id.* at 738. The *Jackson* court found that a "reasonable relation" must exist between the nature and duration of the commitment and the purpose for the commitment. *Id.* Without this balance, the State's interests give way to a Defendant's due process rights under the Fourteenth Amendment. *See id.*

Durant's procedural rights are codified in the same statutes prescribing the formula for determination of his mental competency to stand trial. *See* Title 18 U.S.C. §§ 4241-4248, *et seq.* Title 18 U.S.C. § 4246(a) permits the Government to seek a hearing and order that would stay the release of a person suffering from mental illness or defect if there is evidence that they pose a substantial risk of bodily injury to another person or serious damage to property. In order to do that, several

procedures must be followed. *See* Title 18 U.S.C. §§ 4241-4248, *et seq.* As previously discussed, the parties requested and were awarded judicial determination of Durant's competency pursuant to § 4241. Pursuant to subsection (d), once Defendant was found incompetent he was placed in the custody of the Attorney General who then had four months, and, if necessary, "additional reasonable time" to determine if there was a "substantial probability" that his capacity would return in the "foreseeable future." *See* Title 18 U.S.C. § 4241(d). During this period, § 4247(i) gives the Attorney General the authority to make contracts with a State, locality, agency or other body capable of providing the "confinement, hospitalization, care, or treatment of" a person adjudged incompetent under § 4241. If, as in this case, "suitable arrangements for State custody and care of the person are not available," the Attorney General is required to either release the person or transfer a certificate to the court stating that the release of the prisoner would constitute a "substantial risk" of bodily injury to another person or serious damage to property as described above. *See* Title 18 U.S.C. § 4246(a). Upon receipt of such a certificate, the Court would then order a hearing to take proof that such risk exists. *See id.*

Necessary to said hearing would be information about the detainee during his period of detention. Evidence of his conduct, his response to counseling or treatment and other material necessary to a fair and impartial judgment of his condition would typically be reviewed. Because the Government is already required to produce periodic reports by § 4247(e), this evidence, in theory, should be readily available. Compliance with these procedural requirements serves to protect the Government's case for indefinite detention, if any, as permitted under *Curry. See Curry*, 410 F.2d at 1374. Adherence to these provisions simultaneously safeguards the procedural rights of the Defendant by ensuring that he is not unlawfully detained without having had sufficient opportunity to be reviewed, evaluated and afforded available habilitating treatment. *See id.; see also Morrissey*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484. Doing so, as the *Jackson* court explained, is *necessary* to the cause for indefinite commitment. *See Jackson*, 406 U.S. at 736.

The record demonstrates inadequate attention to Durant's procedural safeguards. While the Court's findings herein do not rest on the length of his pretrial detention alone, the sheer fact that the Defendant has sat in a correctional facility designed to punish convicted felons for almost five

years is particularly telling. The Government has never addressed the issue of his care unless prompted by an order of the Court. When the Government was first directed to find a suitable treatment facility for Defendant, it indicated a need for more time. The court allowed six additional months. At the next hearing the Government claimed the Defendant would be in Puerto Rico by the end of that month. Eight months later, Durant was still at Golden Grove and the Government defended its inaction with a new promise to construct a facility in Anna's Hope. The Court again gave deference. The promised facility was never completed.

Mindful of the fact that the Territory lacks any mental health facility; the Court has repeatedly given the Government leeway where many other courts would not. For four years the Government has been charged with providing a remedy pursuant to § 4247(i). For over two years the Government has failed to do a single thing that would give Durant suitable treatment. In the meantime, Durant has been deprived of counseling, access to proper medical professionals and judicial hearings on the likeliness of his recovery. When the Court scheduled a status conference on the matter over two months ago, Defendant presented the present motion. As before, the Government asked for additional time to respond. Two weeks was granted. Over two months later the Government has still not replied to Defendant's immediate motion. Given the record, the Court does not anticipate one at the point either.

What is at stake for Durant is nothing less than his procedural right to release under § 4247(d). The Government became responsible for the protection of Durant's due process rights when it was awarded custody of him at the June 30, 2003 Competency Hearing. *See Deshaney*, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249. Through its actions and inactions, the Government's conduct went beyond "mere negligence." *See Daniels*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662. In order to maintain a lengthy commitment the Government had the affirmative obligation to protect Durant's procedural rights. *See Curry*, 410 F.2d at 1374. This Court cannot say, nor does it find, that the nature and duration of Selvin Durant's commitment is reasonably related to the purpose of his detention. *See Jackson*, 406 U.S. at 738. While cause for reasonable time was justified in the past pursuit of off-island placement and on-island facilities, nothing about the last two years of inaction justifies the need for more time. Thus, the elements of permanent incapacity and

dangerousness must *necessarily* exist in order for detention to continue. *See Jackson*, 406 U.S. at 736.

The Court has nothing before it that suggests Selvin Durant will become competent to stand trial. The Government did not act within reasonable time to determine the likeliness of Durant regaining capacity. Two years of total inactivity eliminate any chance of the Government being granted additional time on this matter. In order to detain him beyond reasonable time the Government would have needed to show that Durant was dangerous to society. At this point, however, that case cannot be made. By denying Durant access to treatment and periodic reviews the Government has denied him his right to an effective defense. There is no evidence indicating how he takes to treatment or proof that he manifests conduct which makes him a threat to the public. By failing to generate the semiannual reports required under § 4247(e) the Government has both deprived itself of any evidence giving cause to a claim of dangerousness while more importantly depriving Durant of evidence that could merit his release. Furthermore, any evidence obtained at this point would be the product of the Government's own misconduct. The Government cannot argue Durant's current mental state when it can logically be attributed to spending five years in Golden Grove without access to any form of reasonable treatment. Only Dr. Norma Carrillo, whose testimony, as described herein, was premised wholly on methods unsatisfactory to this Court, has ever commented on Durant's potential threat, recommending inpatient treatment to help prevent any threat he might pose to society. Even if the Court chose to give her testimony any weight, her findings are over four years old. Given these factors, the Court cannot objectively pursue a hearing on Durant's threat nor can it continue to detain him in anticipation of the same at the continued expense of his constitutional rights.

At the February 9, 2007 status hearing which the Court ordered *sua sponte,* the Court asked counsel for the Government why it should not immediately order Durant's release. Counsel responded that there were in excess of two dozen similarly situated Defendants in criminal matters. But it is not today the Court's task to determine what happens to any other Defendants. The Court is called upon to adjudicate the case of Selvin Durant. As set forth below, the Government has options if it believes that the community needs to be safeguarded from Durant. The

Government does not, however, have the option of convincing the Court to countenance further violations of Durant's Constitutional rights.

■ The Court does not have before it a shred of evidence that suggests that any efforts are or have been made to render Selvin Durant competent to stand trial. The Court also does not have any evidence from which it can determine if Selvin Durant poses a current risk to the community. The Court hereby orders that the Defendant be released and the charges in both pending criminal actions be dismissed with prejudice. Recognizing the implications of this ruling, the Court stays its order for thirty (30) days. The Government may, during that time, seek relief from the Supreme Court of the Virgin Islands, may commence a civil commitment proceeding upon Durant's release pursuant to Title 19 V.I. CODE ANN. § 722-723 or may seek any other form of relief it deems appropriate.[5]

## B. Challenge to Constitutionality of Title 5 V.I. CODE ANN. § 3637

■ Defendant's motion also requests the court to find Title 5 V.I. CODE ANN. § 3637 unconstitutional. Counsel's request attacks an inapplicable statute. Defendant is being held pursuant to Title 18 Chapter 313 United States Code. He was found mentally incompetent to stand trial. Section 3637 provides for the confinement of persons who are competent to stand trial but plead mental illness as an affirmative defense. Defendant has never been brought to trial and therefore has never had the opportunity or need to raise an affirmative defense to any charges on the basis of mental illness. Accordingly, discussion of § 3637 is irrelevant to the disposition of this case, and the request to find the statute unconstitutional is therefore denied.

A separate Order shall issue ordering same.

---

[5] The Court notes that § 723(f) states that "[t]he Department of Health may transfer any person committed to its custody from one approved public treatment facility to another if transfer is medically advisable." Appropriate long-term commitment, therefore, beyond the period permitted by §§ 722-723, requires either prior agreements for off-island placement or the completion of a mental health facility that comports with Title 19 V.I. CODE ANN. § 718.